In re HANNEVIG.

(Circuit Court of Appeals, Second Circuit. December 7. 1925.)

No. 127.

1. Bankruptcy ⬦➔340—Proof of claim, submitted and sworn to, is prima facie proof, and sufficient, in absence of contradicting evidence.

Proof of claim against bankrupt, submitted and sworn to by claimant, is in itself prima facie proof, and sufficient, unless evidence contradicting it is produced by the objector.

2. Bankruptcy ⬦➔340—Evidence held to show that bankrupt had subscribed for foreign bank stock, for which claim was presented.

In hearing on claim against bankrupt estate, evidence held to establish that bankrupt subscribed for foreign bank stock, for which claim was presented.

3. Evidence ⬦➔37—Judicial notice not taken of laws of foreign country.

Courts do not take judicial notice of the laws of a foreign country.

4. Evidence ⬦➔37—Domestic law will be applied to claim for stock in foreign bank against bankrupt, where foreign law was neither pleaded nor proven.

Where claim was presented against bankrupt for alleged purchase of stock in foreign bank, the domestic and not the foreign law will be applied, where foreign law was neither pleaded nor proven.

5. Corporations ⬦➔78—Subscription for stock implies promise to pay for it.

A subscription for stock implies a promise to pay for it, even though the subscription was before incorporation.

6. Corporations ⬦➔76—Subscription for corporate stock may be made in any way in which other contracts may be made.

A subscription for corporate stock may be made in any way in which other contracts may be made, and any agreement by which a person shows an intention to become stockholder is sufficient to bind both him and corporation.

7. Bankruptcy ⬦➔340—Stock of foreign bank, alleged to have been purchased by bankrupt, held to have actually been allotted to him.

In hearing on claim against bankrupt, evidence held to show that stock in foreign bank, for which claim was made, and alleged to have been purchased by bankrupt, had actually been allotted to him.

8. Corporations ⬦➔90(1)—Nondelivery of stock subscribed for is no defense to action on subscription for stock.

It is no defense to an action on subscription for stock to allege that corporation has not delivered or tendered the certificate of stock to which purchaser was entitled.

9. Bankruptcy ⬦➔340—Bankrupt held not to have been released by foreign bank from obligation of subscription for stock therein.

In hearing on claim against bankrupt for foreign bank stock, alleged to have been subscribed for by him, evidence held not to show that bankrupt was ever released by the bank from the obligation of his subscription.

10. Limitation of actions ⬦➔66(4)—Statute begins to run, as respects subscriptions for stock, only when call is made and due, and only as to such call.

Statute of limitations does not begin to run from time subscription for corporate stock was made, but begins to run when a call is made and is due, and only as to such call.

11. Bankruptcy ⬦➔340—Prima facie case made by submitting proof of claim held not rebutted by bankrupt.

In hearing on claim against bankrupt, prima facie case of liquidator of foreign bank, made by filing proof, held not rebutted by bankrupt, whose name appeared on official records of bank as owner, and who had done nothing to have his name removed therefrom.

Petition to Revise Order of and Appeal from the District Court of the United States for the Southern District of New York.

In the matter of Christoffer Hannevig, bankrupt. Order of District Judge, setting aside order of referee in bankruptcy expunging the claim of Russell Kettle, as liquidator of the British-American Continental Bank, Limited, and allowing the claim, and Henry A. Wise, trustee in bankruptcy, petitions to revise and appeals. Petition to revise dismissed and case affirmed on appeal.

The order involved is one in bankruptcy allowing the claim of Russell Kettle, as liquidator of the British-American Continental Bank, Limited. The proof of debt was filed against the bankrupt on March 11, 1922. The referee· in bankruptcy entered an order expunging the claim on April 27, 1925. The District Judge set aside that order and allowed the claim by an order entered on July 2, 1925. And thereupon the trustee in bankruptcy brought the case to this court.

Saul S. Myers, of New York City (Charles H. Tuttle, of New York City, of counsel), for appellant.

White & Case, of New York City (William St. John Tozer, of New York City, of counsel), for respondent.

Before ROGERS, MANTON, and HAND, Circuit Judges.

ROGERS, Circuit Judge. The claim involved is in the sum of $320,364.80, which is alleged to be due from the bankrupt on unpaid subscriptions on account of the purchase of shares of stock in Hannevig's Bank, Limited, afterwards known ·as British-American & Continental Bank, Limited. The bank is a corporation incorporated by and under the laws of the United Kingdom of Great Britain and Ireland. The claim is filed by the ·official liquidator of the bank, which is in liquidation. It is alleged that the bank allotted to the bankrupt 20,000 shares of £5 each, and that $320,364.80 is due thereon. The trustee of the bankrupt objected to the allowance of the claim.

The petition to revise is dismissed and the case will be heard on the appeal.

It appears that the proven liabilities of the bankrupt, excluding a claim of some $4,000,000 made ·by the ·government of the United States, amount to about $4,000,000, and the estate of the bankrupt consists of about $73,000 in cash. But all that we are now to decide is as to the claim that there is due from the bankrupt to the liquidator of the bank, on his stock subscription, the sum of $320,364.80. Whether there are assets in the bankrupt's estate sufficient to pay in whole or in part the obligation, if it exists, we need not now decide, and are not now concerned to inquire. The sole question this case presents is whether the District Court erred when it entered an order setting aside the action of the referee in expunging the claim of the British-American & Continental· Bank, Limited, and allowed the claim.

[1] The proof of claim, submitted by the liquidator of the bank and sworn to by him, states that the bankrupt "still is justly and truly indebted to the said bank in the sum of $320,364.80." This in itself is prima facie proof, and no further proof needs to be produced unless evidence contradicting it is produced by the objector. In Whitney v. Dresser, 200 U. S. 532, 26 S. Ct. 316, 50 L. Ed. 584, the referee ruled that the verified proof of claim was prima facie proof of the indebtedness, and that the evidence introduced to rebut it was insufficient. The District Court sustained his ruling, and this court, on appeal, affirmed it. The case went to the Supreme Court, which affirmed this court, saying:

"Notwithstanding these forcible considerations, we agree with the Circuit Court of Appeals. The prevailing opinion, not only in the Second Circuit, but elsewhere, seems to have been that way. In re Sumner [D. C.] 101 F. 224; In re Shaw [D. C.] 109 F. 780; In re Cannon [D. C.] 133 F. 837; In re Carter [D. C.] 138 F. 846; In re Doty, 5 Am. B. Rep. 58. See, also, In re Saunders, 2 Low. 444, 446 [Fed. Cas. No. 12,371]; In re Felter [D. C.] 7 F. 904, 906. * * * We believe that the understanding of the profession, the words of the act, and convenient and just administration all are on the side of treating a sworn proof of claim as some evidence, even when it is denied."

We must therefore examine the record to ascertain what proof it contains which contradicts and overcomes the prima facie case made out by the proof of claim. The trustee of the bankrupt, objecting to the claim, states his reasons for objecting on certain allegations which he makes "on information and belief," and there is appended to his formal objection the affidavit of his attorney, who states "he has read the foregoing objections" of the trustee, and knows the contents thereof, and that they "are true according to the best of his knowledge, information, and belief."

The case was heard before a referee in bankruptcy and only one witness was examined. He was called on behalf of the

trustee. At the time he testified he was employed by the trustee, and prior to the bankruptcy proceedings had been in the employ of the bankrupt as his secretary and right-hand man, and had attended to all his personal affairs over a period of years. The following is an excerpt from his testimony:

"Q. Are you familiar with the claim filed by the British-American & Continental Bank? A. Yes.

"Q. What is the claim based on? A. The claim is based on calls and assessments on stock of the Hannevig Bank, Limited, which bank was afterwards changed to the British-American & Continental Bank.

"Q. Who started Hannevig's bank? A. The original incorporators of the Hannevig Bank, Limited, according to my records, were Hans Hannevig, London, Louis Hannevig, of Christiania, Christoffer Hannevig, Sr., of Christiania, and Edward Hannevig, of Christiania and New York.

"Q. This proof of claim is based upon a balance claimed to be due the bank, which is now in the hands of the liquidator, on a subscription for stock that the liquidator claims that Mr. Hannevig subscribed to; what do you know about that? A. In June, 1917, Hans Hannevig cabled Christoffer Hannevig, Jr. (the bankrupt), then in Newfoundland, that he had allocated 20,000 shares in Hannevig Bank, Limited, to Christoffer Hannevig, Jr.

"Q. Was that the first information received by Mr. Christoffer Hannevig or you in reference to the matter? A. Yes.

"Q. That is the first knowledge you had on the subject? A. Yes.

"Q. Will you read into the record so much of the cable as refers to this matter? A. I was familiar with this cable, as Christoffer Hannevig, on his return from Newfoundland, aboard his yacht Ariadne, took this matter, together with other matters, up with me, just prior to his sailing for Norway. The original cable is not here, for the reason that it was aboard the yacht Ariadne and probably destroyed.

"Q. Did you read the cable? A. I did read the cable.

"Q. State the substance of it. A. The substance of the cable was that Hannevig agreed to subscribe 20,000 shares in Hannevig Bank, Limited, in London.

"Q. What did you or Mr. Hannevig do in reference to that cable? A. Prior to this conference, and while Hannevig was still in Newfoundland, his brother Edward, one of the originators of the bank, was in my office

in New York and transmitted the following cable to Christoffer Hannevig in Newfoundland.

"Q. What month was that? A. That was June 18, 1917.

"Q. Read as much of this cable into the record as refers to this matter. A. 'Received following cables from Hannevig London: Referring your cable from Harbor Grace cable authority sign in your name for the one hundred thousand pounds subscription in Hannevig Bank, Limited. Also may I nominate you director Hannevig Bank. Telegraph reply yesterday's telegram regarding signing application shares stock. Please telegraph instructions. [Signed] Edward Hannevig.'

"Q. Did you help Edward Hannevig draft that cable? A. This cable was drafted in my presence.

"Q. Was it discussed with you before it went out? A. Yes.

"Q. What is the purport of it? What does it all mean? A. The idea of the cable was simply to ask Christoffer Hannevig for instructions.

"Q. Instructions for what? A. For the authority of Hans Hannevig to sign subscription blanks for shares in the Hannevig Bank, Limited.

"Q. You mean Edward, who was in New York, was telegraphing to Christoffer Hannevig, the bankrupt, asking Christoffer Hannevig to give authority to Hans Hannevig in London to sign the name of Christoffer Hannevig to an application for these shares; is that right? A. That is correct.

"Q. What was the next step? A. The next telegram is from Christopher Hannevig, Inc., to Christoffer Hannevig, Yacht Ariadne, at Bath, Me. I quote the telegram: 'London telegraphs account shares Hannevig Bank telegraph ten per cent. payable now further fifteen per cent. due August. Please telegraph us instructions.'

"Q. What did you do about that? A. In reply to that telegram is the instruction dated July 2, 1917, from Bath, Me., addressed to Christoffer Hannevig, Inc., New York City: 'Please remit London ten thousand pounds as soon as Ames contracts paid.'

"Q. What was the next step after that? A. About this time, Christopher Hannevig, still in Newfoundland, instructed his brother, Hans Hannevig, to buy the yacht Exen, which was being offered for sale by the British Prize Court. According to the cables which I have seen, which I am not able to put into the record for the reason that they

were aboard the yacht Ariadne and destroyed, he instructed Hans Hannevig to buy the yacht Exen at the best possible price.

"Mr. Tozer: I think I ought to enter an objection here, on the ground that this has no bearing on this question.

"Mr. Myers: It is all by way of introduction.

"Mr. Tozer: I don't object to it as incompetent, but as irrelevant and immaterial.

"The Witness: Hans Hannevig purchased this yacht after receiving instructions from Christoffer Hannevig, Jr., to put the sale through in the name of Hannevig Brothers, Limited. The purchase price was £10,000. He then arranged that Hannevig Bros. would sell the yacht to him for £20,000, and he then gave a bill of sale to his brother, Christoffer Hannevig, Jr., at the price of £20,000. When Christoffer Hannevig found out that his brother had manipulated the sale so as to make a personal profit for himself of 100 per cent., he instructed Hans Hannevig to cancel his subscription to the stock in Hannevig Bank, Limited. This instruction was by cable. He furthermore cabled Hannevig, Inc., New York, on July 18, 1917, as follows: 'Has London canceled my bank subscription and returned money? Telegraph.' This telegram was from St. Johns, Newfoundland. On the same day, Edward Hannevig, of Hannevig Bank, Limited, then in New York, cabled his brother, Christoffer Hannevig, St. Johns, Newfoundland, as follows: 'Hannevig, London telegraphed July 12th your shares allotted. Telegraph if you wish me endeavor dispose of them. I replied you were on way Norway and told London communicate you Christiania.'

"Q. Were there any conferences between you and Edward Hannevig up to this time, outside of what you have testified to? A. Well, as soon as Hannevig, Inc., received word from Christoffer Hannevig that he wanted his subscription canceled, I had numerous talks and conferences with Edward Hannevig to dispose of the shares, because Edward was one of the original members of the bank, and I felt that he could prevail upon his brother Hans to make some other arrangement, or get some one to buy the shares and take over the subscription.

"Mr. Myers: The original subscription agreement produced by the claimant reads as follows: 'Hannevig Bank, Limited. To the Directors of Hannevig Bank, Limited: Having paid to your bankers the sum of £9,999–10, being a deposit of 10/per share on application for 19,999 shares of £5 each, in the above-named company, I request that you will allot to me that number of shares, and I hereby agree to accept the same, or any less number that may be allotted to me, upon the terms of the memorandum and articles of association of the company, and I authorize you to register me as a holder of the shares. Usual signature: Chr. Hannevig, by His Agent, Hans Hannevig. Address in full: 139 Broadway, New York. Description or occupation: Shipbuilder. Dated: July 5, 1917. Names in full: Christoffer Hannevig.'

"Q. Now, Mr. Simpson, this application for shares which has been read into the record states that Christoffer Hannevig requests that he be allotted 19,999 shares at £5 a share, and that he agrees to accept the same, or any less number that may be allotted to him, upon the terms of the memorandum and articles of association of the company, meaning Hannevig Bank, Limited; did you ever have or see any memorandum and articles of association of Hannevig Bank, Limited? A. No."

[2] The evidence establishes beyond controversy that the bankrupt subscribed for the stock in the bank. But we are urged to hold that his subscription never became effective, inasmuch as no stock was ever allocated to him by the corporation. We are informed that in England a contract of a subscription for shares is entered into in a different manner than in this country, and does not become binding until it has been formally accepted by the corporation; that the corporation must first allot the desired number of shares, and then give notice of the allotment to the subscriber or applicant; that the notice is of the essence of the contract; and that in this case no allotment was made and no notice given to this bankrupt.

[3, 4] Two answers to all this may be made. The first is that courts do not take judicial notice of the laws of a foreign country. In Talbot v. Seeman, 1 Cranch, 1, 38 (2 L. Ed. 15), Chief Justice Marshall, delivering the judgment of the Supreme Court in an admiralty case, said: "That the laws of a foreign nation, designed only for the direction of its own affairs, are not to be noticed by the courts of other countries, unless proved as facts, and that this court, with respect to facts, is limited to the statement made in the court below, cannot be questioned."

In Liverpool & Great Western Steam Co. v. Phenix Insurance Co., 129 U. S. 397, 9 S. Ct. 469, 32 L. Ed. 788, the court refers to the settled doctrine that, while the federal courts

take judicial notice of the laws of the several states of the Union, they do not take cognizance of the law of another country without plea and proof, and the court added that this rule has been constantly maintained at law and in equity in England and America. As the law of England was neither pleaded nor proved, we must apply to this case, therefore, the domestic and not the foreign law.

[5, 6] In the United States, a subscription for stock implies a promise to pay for it, even though the subscription was before incorporation. Sanger v. Upton, 91 U. S. 56, 23 L. Ed. 220; Cook on Corporations (7th Ed.) vol. 1, p. 312, § 73, and the cases there cited. See, also, Avon, etc., Co. v. Kellogg, 125 App. Div. 51, 109 N. Y. S. 153, affirmed 194 N. Y. 567, 88 N. E. 1132; Buffalo, etc., R. R. Co. v. Gifford, 87 N. Y. 294; Buffalo, etc., R. R. Co. v. Dudley, 14 N. Y. 336. And in this country the rule is that a subscription may be made in any way in which other contracts may be made, and that any agreement by which a person shows an intention to become a stockholder is sufficient to bind both him and the corporation. Cook on Corporations (8th Ed.) vol. 1, § 52.

[7] The other answer is that the evidence in the record shows to our satisfaction that an allotment of this stock to the bankrupt was actually made. The witness called for the trustee of the bankrupt testified that he was familiar with the claim filed and that it was "based on calls and assessments." We think it is fair to conclude that an English corporation does not make calls and assessments on stock which has not been allotted. Moreover, the evidence actually indicates that the stock was allotted to the bankrupt on July 9, 1917, and that on July 12 a cable was sent from London, notifying the bankrupt, "Your shares allotted." But for reasons already stated, the liability on this subscription being dependent on the law of this country, and not that of England, the question whether there was an allotment of this stock, and the bankrupt was duly notified that the allotment had been made, is not of importance.

We may add that the evidence shows that the bankrupt actually paid to the bank 25 per cent. of his subscription, and that this was done after he was informed in July, 1917, by his New York office, "London telegraphs account shares Hannevig Bank telegraph ten per cent. payable now further fifteen per cent. due August. Please telegraph us instructions." And to this the bankrupt replied: "Please remit London ten

10 F.(2d)—60

thousand pounds as soon as Ames contracts paid." It also appears further in the testimony of this witness that he was asked and testified as follows:

"Q. Now, after the payment of the 25 per cent. subscription referred to in one of these cables, did you or Mr. Hannevig ever make any further payments on account of these subscriptions? A. No further payments were made."

It being settled that the bankrupt made a valid subscription to the stock, and that he paid thereon 25 per cent. of the amount thereof, and no more, the question which remains to be considered is whether he has ever been released from his liability thereon. [8] It is said that no certificates of stock were ever issued to him. For reasons already stated, we need not inquire what, under English law, is the rule as to the issuance of shares of stock to a subscriber. But in this country the law is well settled that it is no defense to an action on a subscription to allege that the corporation has not delivered or tendered to the defendant the certificate of stock to which he is entitled. Sanger v. Upton, 91 U. S. 56, 23 L. Ed. 220; Upton v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203; Burr v. Wilcox, 22 N. Y. 551. See Cook on Corporations (8th Ed.) vol. 1, p. 603, § 192, and cases there cited.

It is entirely clear that after the misunderstanding which arose between the bankrupt and one of his brothers, arising out of the purchase of the yacht Exen, hereinbefore mentioned, the bankrupt gave instructions by cable to cancel his subscription to this stock. It also appears that in response to this cable his request to cancel was refused; and there is nothing in this record which shows that it was ever canceled.

We come now to another phase of this controversy. The contention is made by the trustee of the bankrupt that, after this subscription to the stock was made, all the bankrupt's right, title, and interest in and to the shares was transferred by the bankrupt to his father, Christoffer Hannevig, Sr., with the knowledge and approval of the bank, and that the bank thereafter recognized the father as the subscriber, and as the party entitled to the stock, and ceased to regard the bankrupt as the contracting party.

We have closely scrutinized the record in this case. It contains no evidence that the bank was ever asked by the bankrupt to transfer the stock to his father, and to look to his father, and not himself, as the person who was to pay the balance due from him on

the stock. There is in the record a cable from the liquidator of the bank, in London, to the attorneys for the claimant, in New York, which states, "No transfer from junior [Hannevig, the bankrupt] to senior [the bankrupt's father] has been made or notified." The cablegram may be seen in the margin.[1]

It is true that in July, 1918, share certificates were made out in the name of Hannevig, Sr., and were recorded as a part of his holdings. The English liquidator of the bank states that this was done in error, and that subsequently, some doubt arising as to whether this stock belonged to Hannevig, Sr., or to Hannevig, Jr., notice was given to both of the doubt, and the senior Hannevig objected, "and upon consideration of the facts and advice of counsel" the list was amended and the 20,000 were settled in the name of Hannevig, junior, and that he was duly advised that he had the right to apply to the court within 21 days if dissatisfied, and that he made no objection to what was done. It is said that under English law, as Hannevig, Jr., made no objection within the 21 days, he is bound. As no proof of the English law was pleaded or proven, we disregard the statement as to the English law. But it appears that no papers at any time were presented to or filed in the bank, whereby the bank was authorized by Hannevig, Jr., to issue the stock to Hannevig, Sr.

[9] We do not feel justified upon such a record in saying that the facts disclosed herein show that the bankrupt was ever released by the bank from the obligation of his subscription. It is evident that Hannevig, Sr., denies that he entered into any agreement to assume the obligation of the stock subscription, and also that the English liquidator, upon investigation of the transaction and "upon advice of counsel," believes either that no such agreement was made, or, if made, was ever assented to by the bank. And this court, upon this record, cannot find that the bank ever canceled the subscription made by the bankrupt, or ever intended to accept the bankrupt's father in his place and stead. The fact is clear that, when the bankrupt asked in 1917 to have his subscription canceled, his request was flatly refused. All that we have in this record to support the claim that the bankrupt is not liable is that no certificates were ever issued to the bankrupt, and upon that fact we have already commented, and in addition two other facts which remain to be considered.

It appears that no demand for the payment of this subscription was made on the bankrupt during the years 1917, 1918, 1919, 1920, and 1921, at least until after the bank became insolvent in that year and an official liquidator was appointed. Then it seems that the New York Hannevig, bankrupt herein, was notified by the English liquidator of the bank to pay £1 per share. In reply to that demand the bankrupt expressed no surprise, and did not in any way disclaim liability. This is what he wrote:

"I have to acknowledge receipt of your notice calling up £1 per share, and in reply I beg to state that I am unable to pay anything at the present time for the reason that all my money is invested in the Pusey & Jones Company, of Wilmington, Del., U. S. A. This company has been, since I bought it, under contract with the United States Shipping Board to build ships and have delivered 34 steamers during 1918, 1919, and 1920, ranging inside 4,200 to 13,000 tons d. w. for which work United States Shipping Board are indebted to the Pusey & Jones Company for approximately $14,000,000. *As soon as this will be paid I will be in position to forward you check in accordance with your request.* However, as your interests are now identical with mine, I shall be glad to know if you have any suggestions to make, by which an early settlement might be arrived at with the United States Shipping Board."

This was not the letter of a man who considered that he was under no liability. In it he admits liability, and states that on the happening of the event named in his letter he "will be in position to forward you check in accordance with your request." And it is observed that this letter was written after the temporary certificates for this stock had been erroneously delivered to Hannevig, Sr., which happened in July, 1918.

---

[1] "Christoffer Hannevig stop Application for twenty thousand shares in name of Christoffer Hannevig not specifying senior or junior but address given 139 Broadway, New York, made by his agent Hans Hannevig stop Share certificates in error made in name of Hannevig senior handed to Christoffer Hannevig whether senior or junior not clear on July 4th, 1918, and shares recorded as part of senior's holdings stop When settling list of contributories of which notice given to both senior and junior, senior objected and upon consideration of facts and advice of counsel list amended and 20,000 shares settled in name of junior who was duly advised and told that he had right to apply to court within twenty-one days if dissatisfied. He made up application and list as amended final under English law which suggest must bind junior and his trustee stop No transfer from junior to senior of the shares has been made or notified."

The confusion between Hannevig, the father, and Hannevig, the son (this bankrupt), easily arose from the fact that, while each had the same Christian name, neither of them distinguished himself from the other by the use of "Sr." and "Jr." The witness testified:

"Q. And where you refer to Christoffer Hannevig, without designating Sr. or Jr., you mean the bankrupt, Christoffer Hannevig, Jr.? A. Yes.

"Q. How did the bankrupt usually sign himself, did he use the word 'junior' or just sign 'Christoffer Hannevig'? A. He just signed Christoffer Hannevig."

[10] Before concluding this opinion we may mention that the statute of limitations in bar of the claim has not been interposed as a defense to the claim. Neither does the brief or the argument of counsel contain a reference to the statute. We allude to the subject only to say that, as respects subscriptions to stock, the statute does not begin to run from the time the subscription is made. It begins to run when a call is made and is due, and only as to such call. Glenn v. Marbury, 145 U. S. 499, 12 S. Ct. 914, 36 L. Ed. 790; Hawkins v. Glenn, 131 U. S. 319, 9 S. Ct. 739, 33 L. Ed. 184; Glenn v. Liggett, 135 U. S. 533, 10 S. Ct. 867, 34 L. Ed. 262. Cook on Corporations (8th Ed.) vol. 1, p. 613, § 195. And it is not shown or claimed that any call was made on the bankrupt which he declined to pay, except the call made by the official liquidator of £1 per share, alluded to in the bankrupt's letter of October 13, 1921, and to which reference has already been made.

We have not overlooked the testimony of the bankrupt's secretary that on Hannevig's return to this country from Norway, in October or November, 1917, he was instructed by the bankrupt to transfer on his records the amount of $119,108.13 and charge that amount to Christoffer Hannevig, Sr. "This amount," continued the witness, "represented the £25,000 that had been paid to Hannevig Bank on the original subscription for the stock." He added: "My instructions from Hannevig were to charge this amount to his father, because he had made an arrangement by which his father would take over the shares."

That is all that the witness knew—that Hannevig, Jr., told him that it had been agreed between father and son that the father in effect would assume the subscription. But it nowhere appears that the father did assume it, or that the bank agreed to substitute the father, and accept him in the place and stead of the son, or that the bank ever knew that the two Hannevigs made such an agreement between themselves, and assented to it. And it was after this alleged agreement between father and son was made, in 1917, that the son wrote the letter of October 18, 1921, to the liquidator of the bank (hereinbefore quoted), in which he acknowledged receipt of the notice calling upon him to pay £1 per share and replied, "I am unable to pay anything at the present time," because all his money was at the time invested in the Pusey & Jones Company, and that as soon as that company collected its claim from the United States Shipping Board, amounting to $14,000,000 he would be able to forward his check as requested.

[11] In view of the whole record, and of the fact that at the present time the name of the bankrupt appears on the official records of the bank as the owner of the 20,000 shares of stock, and that fact is known to him, and he has done nothing to have his name removed from the list, we are unable to say, upon the record as it is presented, that the bankrupt has rebutted and overcome the prima facie case made by the filing of the proof of claim.

The order of the District Judge is affirmed.