STAHL, Circuit Judge,
dissenting.'
In 2007, Victor Garcia Garcia, a member of Guatemala’s indigenous Maya community, was scooped up in a large raid on a factory in New Bedford, Massachusetts, whisked away to a border detention center in Texas several days later, and, following a group hearing before an Immigration Judge, ordered removed from the United States. During these proceedings, Garcia did not have access to an attorney, nor was an interpreter made available to him (an interpreter would have certainly come in handy because the group hearing was conducted in Spanish, a language that Garcia does not understand). Returned to the same life of persecution in Guatemala that had led him to seek refuge here in the first place, Garcia reentered the United States and sought asylum.
Today, the majority holds that Garcia cannot apply for asylum, despite having made the higher threshold showing of likely harm that is required for an alien to acquire a temporary grant of withholding of removal. This is so, the majority postulates, because the Attorney General has ordained it as such through his own preferred statutory interpretation under Chevron, construing the reinstatement statute of the INA, 8 U.S.C. § 1281(a)(5), which states that an alien subject to a reinstated order of removal “is not eligible and may not apply for any relief,” as trumping the broad grant of asylum in 8 U.S.C. § 1158(a)(1), which provides that “[a]ny alien who is physically present in the United States or who arrives in the United States ... irrespective of such alien’s status, may apply for asylum in accordance with this section.” Because administrative law, like baseball, has its own default rule in cases like this—tie goes to the agency—in my view the majority mechanically applies that default rule, ignoring the fact that Garcia was denied due process in his initial removal proceedings and failing to address the degree to which the agency’s interpretation violates the spirit, if not the letter, of various U.S. treaty obligations.
Because the majority’s interpretation would put the United States in violation of international law, and countenance the flagrant due process violations that occurred below, I would find this interpretation of the relevant ambiguous provisions of the INA unreasonable under the Charming Betsy doctrine, which counsels that “an Act of Congress ought never to be construed to violate the law of nations if any *44 other possible construction remains.” Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804). Since it is beyond doubt that courts play a crucial role in ensuring that the United States complies with its treaty obligations, barring some clear indicia of Congressional intent to violate a,treaty via statute, and because the majority’s approach contravenes our obligations under international law and the due process protections that litigants like Garcia should rightly expect from our court system, I respectfully dissent.
I. Facts & Background
Because the majority glosses over (or ignores .completely) significant portions of the factual record, including facts that bear directly on Garcia’s Charming Betsy argument, I set forth below the salient facts before explaining why I believe the legal result that the majority reaches is incorrect.
A. Garcia’s Background in Guatemala
Garcia is a member of Guatemala’s indigenous Mayan community, and grew up speaking an indigenous language, K’iche. The Maya have often suffered at the hands of the ruling elite, made up primarily of the mixed-race Ladino community. During the Guatemalan Civil War, the national army and local La“dino citizen-patrols, paramilitary organizations which operated with impunity, conducted a systematic military campaign against the Maya. The Historical Clarification Commission, established by the 1996 Peace Accords, found that racial and ethnic animus constituted the reason for these attacks and atrocities, and that the Guatemalan State had “committed acts of genocide against groups of Mayan people” in four regions, including Garcia’s home region of Zacualpa, Quiche. See Historical Clarification Report, Conclusions ¶¶ 110,122.
Against that historical backdrop, Garcia put forth the following factual allegations. As a child, Garcia and his family were frequently forced to flee into the mountains when the army conducted sweeps of his village—sweeps that often resulted in summary executions and beatings for those unable to escape. Garcia resisted the Ladinos’ efforts to draft him into them patrols, and endured at least one beating at the hands of the militia, who insulted him with racial epithets.
Far from being simply caught up in the widespread violence and unrest plaguing the country at the time, the record indicates that Garcia’s family was the subject of particular ill-treatment because they were leaders in the indigenous community and in the local Catholic Church, and because following the conclusion of the Civil War, they began a long campaign to seek justice for Garcia’s father and other indigenous civilians that were disappeared or were executed during the war. Ladino armed groups retaliated against Garcia, on one occasion beating him and attacking him with a knife. After this incident, Garcia was unable to walk for 15 days.
As the threats against him worsened, Garcia, fearing for his life, fled Guatemala in early 2004, hoping to join one of his brothers who was then living in New Bed-ford, There, Garcia lived in an underground community of other Mayans who had fled Guatemala, joined a prayer group at a local Catholic church, and became active in a local indigenous organization. He never applied for asylum in the United States during that period of time, and counsel for Garcia suggests that this was because he remained traumatized from the events in Guatemala and spoke only minimal Spanish and no English.[14]
*45 B. Initial Removal Proceedings
Immigration authorities detained Garcia in March 2007 during a raid on the factory in New Bedford, Massachusetts, at which Garcia had been clandestinely employed. After two days at a temporary holding facility, and without the opportunity to consult with an attorney, Garcia was transferred to a detention facility in southern Texas. On March 21, 2007, in a group hearing before a Texas Immigration Court with proceedings conducted in Spanish, Garcia accepted a removal order entered against him and did not reserve his right to appeal. Although the record is less than clear on this point, it appears that Garcia neither had access to an attorney during this proceeding, nor was there a K’iche interpreter available.
However, shortly after this hearing in 2007, a group of attorneys traveled to Texas with the assistance of a K’iche-speaking interpreter and met with Garcia and other detainees. Following this meeting, the attorneys, on Garcia’s behalf, sought to reopen the appeal, arguing that his waiver of his right to apply for asylum and his right of appeal were coercive because he was denied his due process .rights during the course of the initial proceedings, including the right to an attorney. In an opinion dated August 10, 2007, the BIA rejected Garcia’s argument, finding that “[t]he Immigration Judge explained to the respondent, along with others at the group hearing, his rights in Spanish, including the right to appeal any adverse decision. The Immigration Judge also explained that the respondent had a right to counsel at that hearing.” Garcia filed a motion to reconsider the BIA’s decision, which was denied. At no point during these various appeals did the BIA address the fact that Garcia did not speak Spanish. Garcia was then removed to Guatemala.
C. The Majority’s Approach
The majority opinion alludes to these procedural defects in the underlying removal proceedings, but gives them short shrift:
Three years later, in 2007, immigration authorities in the United States apprehended Garcia, detained him, and then ordered him removed from this country. From all that the record reveals, it appears that Garcia would have been successful in obtaining asylum had he sought it at that time. And, it appears, too, he may have been entitled to withholding of removal. But, he did not request either asylum or withholding of removal, apparently because of the language barriers he faced and because he was uncounseled. See ante at 33. .
The majority in this passage concedes that Garcia would have likely been “successful in obtaining asylum” at the time of his initial removal proceedings, but did not have an opportunity to .do so because he did not have access to a lawyer and because he did not speak the language in *46 which the proceedings were conducted. We can surmise, as his counsel argued before the Immigration Judge in the 2015 proceedings, that Garcia had no idea what was going on at this en masse hearing at the border detention center.[15] By the time the attorneys arrived in Texas to meet with Garcia and other similarly situated indigenous persons, it was too late, because he had already been ordered removed and waived his right to appeal.
Garcia would later contend that he never had a meaningful opportunity to apply for asylum during these proceedings, but to no avail. The BIA ruling in 2015 disposed of this argument in a single sentence, concluding that “[tjhough the applicant asserts he was not accorded due process in the course of his prior removal proceedings, the Immigration Judge and this Board do not have authority to review those proceedings.” The majority opinion of this panel, despite, in my view, having such authority to review the underlying removal order—a topic to which I will turn shortly—devotes only the aforementioned four sentences to the obvious due process defects in Garcia’s underlying removal order.
D. Return' to Guatemala and Subsequent Reentry
Things did not improve for Garcia after he returned to Guatemala. Ladino gangs frequently harassed Garcia, on at least one occasion shooting at him while he rode his bicycle, forcing him to flee into the woods. Once again, his efforts to organize the indigenous community through leadership in his local church were not met with enthusiasm on the part of the Ladino gang leaders, many of whom directly retaliated against Garcia’s family. The frequency of harassment by the militia groups increased until, on February 10, 2015, Garcia and his son decided to flee Guatemala and join family members who had previously been granted asylum and resided in New Bed-ford. Garcia’s wife and seven children remain ■ in Guatemala, and have informed Garcia that it is not safe to return.
E. Administrative Proceedings Below
DHS apprehended Garcia at the border, and subsequently allowed him to travel to Massachusetts. After receiving notice that his previous removal order would be reinstated, Garcia was given a reasonable fear interview by an asylum officer on May 19, 2015, which was conducted with the assistance of a K’iche-speaking interpreter. The asylum officer found that Garcia had a reasonable fear of persecution if he were returned to Guatemala, and allowed him to apply for withholding of removal. At his hearing before the Boston Immigration Court, again with the assistance of an interpreter, Garcia argued that in addition to applying for withholding of removal, he should be permitted to apply for asylum, and that the automatic reinstatement of his prior removal order would violate U.S. obligations under the 1967 Refugee Protocol.[16]
*47 The IJ found Garcia to be a credible ■witness and ruled that he had established past persecution as well as a likelihood of future persecution. He therefore granted Garcia’s application for withholding of removal. However, the IJ did not consider Garcia’s asylum claim, concluding (as the majority does) that he was ineligible to apply for asylum under the INA because of the previous removal order. Additionally, the' IJ rejected (with no accompanying analysis) Garcia’s argument that a reading of the statutory language to bar asylum claims would be in tension with the Refugee Protocol. In that same opinion, the IJ rejected Garcia’s argument that he had not previously been afforded a meaningful opportunity to apply for asylum, citing the 2007 BIA decision which had found that the Garcia had his “rights [explained in] Spanish.”
Garcia appealed to the BIA. In a two-page order, the BIA denied Garcia’s appeal, and concluded that “[n]either section 241(a)(5) of the Act nor its implementing regulations authorize the applicant to be considered for asylum.” Although Garcia renewed his argument to the BIA that he had not previously had the opportunity to apply for asylum because of the procedural defects of his 2007 removal proceedings, the BIA concluded that it lacked “authority to review those proceedings.”
F. Garcia’s Current Status
Thus began Garcia’s sojourn through the legal limbo that the majority, today, suggests is the very position where Congress would want him. Having been granted withholding of removal, Garcia’s only security is that he cannot be sent back to Guatemala. His actual position, however, is more precarious. A grant of withholding of removal does not prevent his transfer to a third country. See 8 C.F.R. § 1208.16(f). He therefore lives under a cloud of possible relocation, and should the government decide to effect such a transfer, he would have no say in the matter. Additionally, while aliens granted withholding of removal are eligible to apply for work permits, these employment authorization documents are granted at the discretion of USCIS and are granted in increments. See 8 C.F.R. § 274a.l2(a)(10). Such aliens must reapply for this document before it expires, often encountering long processing delays, and cannot work legally unless and until the authorization document is renewed.[17] Id. Furthermore, individuals in withholding of removal status are not eligible for travel documents necessary for reentry into the United States after foreign travel, while aliens who have been granted asylum or refugee status may obtain such documents.[18]
*48 Adding insult to injury, withholding of removal carries with it no options for bringing family members to the United States, while an alien granted asylum can apply for derivative asylum status for his spouse and minor children. See Burbiene v. Holder, 568 F.3d 251, 256 n.5 (1st Cir. 2009) (noting that “there can be no derivative beneficiaries of a grant of withholding of removal”). Indeed, DHS regulations require that an alien who has been denied asylum status, but granted withholding of removal, must have his or her asylum application reconsidered. See 8 C.F.R. § 1208.16(e) (“In the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant’s spouse or minor children following to join him or her, the denial of asylum shall be reconsidered.”)
Just consider that if Garcia had access to an attorney, the benefit of legal proceedings in a language he understood, or even just an interpreter, during his initial detention and removal, he could have then applied for asylum and withholding of removal concurrently. If the government had denied his application for asylum, but later granted withholding of removal, the government would be compelled to reconsider his asylum application by virtue of the fact that withholding of removal alone “preclude[s] admission of the applicant’s spouse or minor children.” Id. The government apparently recognizes the absurdity of denying to the alien the right to try to bring his family to the United States because he has met the higher threshold required for withholding of removal, as opposed to the lesser showing that is required for the discretionary grant of asylum.[19] Hence the requirement that the government reopen the asylum claim in that situation.
Garcia is essentially overqualified for the relief that he seeks: he falls into the “narrower class of aliens who are given a statutory right not to be deported to the country where they are in danger,” but misses out on membership in the “broad class of refugees who are eligible for a discretionary grant of asylum,” all because he was initially removed from the country without due process. Cardoza-Fonseca, 480 U.S. at 424, 107 S.Ct. 1207. Yet had he been afforded a modicum of process and then had his asylum application denied, the government would be obligated to reopen that asylum application if he was subsequently granted withholding of removal.
Today we are told by the majority that the Attorney General’s interpretation of the INA, which produces the absurd and counterintuitive result that I have just outlined, is reasonable because it is a permissible construction of a statutory ambiguity. This is so even though a separate provision of the INA provides that “any alien who is physically present in the United States or who arrives in the United States ... irre *49 spective of such alien’s status, may apply for asylum.” 8 U.S.C. § 1158(a)(1) (emphasis added). Even under Mark Twain’s more pessimistic assessments of Congressional sagacity,[20] I cannot agree that the result the majority reaches today is one that Congress would desire.
II. Due Process Considerations
Before proceeding to what I believe is the main flaw in the majority’s reasoning, the failure to adequately consider the Charming Betsy question and the tension between the agency’s interpretation in this case and U.S. treaty commitments, I want to briefly explain why a contrary holding is not necessarily inconsistent with other circuits that have held in favor of the reinstatement statute in similar cases, and why I believe that we have jurisdiction to look behind the underlying removal order and to examine whether Garcia’s due process rights were violated.
A. Other Cases Interpreting This Statutory Interplay
While the majority is quite correct that other circuits that have encountered this statutory tension have sided in favor of the reinstatement bar, none of these cases, as far as I can discern, involved petitioners whose initial removal proceedings were infected with the procedural irregularities which occurred here. Furthermore, some of these courts noted the due process tensions when .applying the reinstatement statute mechanically, but found them inapplicable to the eases at hand.
For instance, in Herrera-Molina v. Holder, the Second Circuit rejected the petitioner’s argument that Section 241(a)(5) “deprives him of due process,” while noting that “Herrera-Molina does not allege any impropriety” in the underlying removal proceedings and “does not argue that those earlier proceedings deprived him of due process.” 597 F.3d 128, 139-40 (2d Cir. 2010). Because the petitioner did not raise that argument, the court did “not consider whether [it] would have jurisdiction to review legal or constitutional challenges to the validity of that underlying deportation order.” Id. at 140 n.9.
In Perez-Guzman v. Lynch, the Ninth Circuit noted that the petitioner had “testified before the IJ that the Border Patrol agents never asked him whether he feared returning to Guatemala,” but also concluded that “[rjecords of a brief interview conducted during the expedited removal process, however, note Perez answered in the negative when asked whether he feared returning to Guatemala.” 835 F.3d 1066, 1070-71 (9th Cir. 2016), reh’g and reh’g en banc denied (No. 13-70579, Apr. 26, 2017). There is nothing in Perez-Guzman that suggests the petitioner did not speak the language in which the proceedings were conducted. By contrast, Garcia has testified that he was never asked whether he feared returning to Guatemala.[21] Of course, he may have been asked in Spanish, but I struggle to see how this is much better than not being asked at all.
*50 Furthermore, in that same case, the Ninth Circuit noted that “[t]he Attorney General’s interpretation of § 1231(a)(5) may have dire humanitarian consequences for individuals in reinstatement who seek relief from removal ... because they were improperly denied an opportunity to seek asylum during their earlier removal from the United States.” Perez-Guzman, 835 F.3d at 1081. The Ninth Circuit’s rejoinder to this point, that “the government has discretion to forgo reinstatement and instead place an individual in ordinary removal proceedings,” id., would seem to be cold comfort to aliens who, like Garcia, are not so fortunate as to be showered with the government’s magnanimity.[22]
In short, none of our sister circuits, as far as I can gather, have encountered a comparable set of facts to those undergird-ing Garcia’s appeal at the time that they answered this same statutory riddle. Nor did any of them address the tension between the agency’s interpretation of the INA and international law, an issue of first impression in our circuit.[23] For these reasons, I do not find these opinions persuasive.
B. The Court’s Jurisdiction to Examine Underlying Removal Orders
The procedural defects in the 2007 removal proceedings are, admittedly, not front and center in the petitioner’s presentation of his case.[24] He focuses, like the majority does, on the statutory interplay between the asylum and reinstatement of *51 removal provisions. However, Garcia did argue below, and renews the point on appeal in his brief, that he “was never provided a real opportunity to apply for asylum” when he was initially removed in 2007. Because these statements in his brief and the descriptions of his initial confinement and removal are both sufficiently detailed to put this court on notice and sufficiently shocking that such notice should be heeded, I would conclude that the issue is properly before us.[25]
To be sure, the removal statute itself provides that “[t]he prior order of removal ... is not subject to being reopened or reviewed,” 8 U.S.C. § 1281(a)(5), and some courts have interpreted this as erecting a strict bar to judicial review of such orders, see Ramirez-Mejia, 794 F.3d at 489 (“This court has jurisdiction to review the lawfulness of a reinstatement order but not the underlying removal order.”); Garcia v. Mukasey, 531 F.3d 141, 150 (2d Cir. 2008) (concluding that “the reinstatement of removal statute expressly prohibits us from giving petitioner a second bite at the apple”).
However, as other courts have recognized, there is more to this story. The Supreme Court has held that reading the IIRIRA to “entirely preclude review of a pure question of law by any court would give rise to substantial constitutional questions” under the Suspension Clause.[26] I.N.S. v. St. Cyr, 533 U.S. 289, 300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). In light of the “longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction,” the Supreme Court interpreted three separate provisions of the IIRIRA and concluded that they had not clearly repealed the general grant of habeas jurisdiction to federal courts. St. Cyr, 533 U.S. at 298, 121 S.Ct. 2271. Other courts have recognized similar constitutional problems with a literal reading of § 1231(a)(5) that precludes all judicial review of the underlying removal action. See, e.g., Ramirez-Molina v. Ziglar, 436 F.3d 508, 513 (5th Cir. 2006) (“[I]f there were no judicial review available to an alien in the initial removal proceedings, then § 1231(a)(5)’s foreclosure of judicial review of constitutional and legal claims regarding that order after reinstatement arguably would implicate the Suspension Clause concerns articulated in St. Cyr.”).
Additionally, while a separate provision of the INA precludes judicial review over some cases, § 1252(a)(2)(D) exempts constitutional issues from this restriction;
Nothing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitu *52 tional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.” 8 U.S.C. § 1252(d); see also id. § 1252 (b)(ii) (stating that no court shall have jurisdiction over discretionary actions taken by the Attorney General and Secretary of Homeland Security “other than the granting of relief under Section 1158(a),” which governs asylum).
In Debeato v. Att’y Gen, of U.S., the Third Circuit concluded that “there is no principled reason for reading § 1252(a)(2)(D) as permitting jurisdiction to review a final removal order, yet denying jurisdiction to review a reinstatement of that very same order.” 505 F.3d 281, 234-35 (3d Cir. 2007); see also Ramirez-Molina, 436 F.3d at 513-14 (“Because § 1231(a)(5) limits judicial review, § 1252(a)(2)(D) prevents its operation in cases, such as this one, in which the validity of an underlying order is questioned on constitutional or legal grounds.”).
This court has previously suggested that the automatic reinstatement of a prior removal order could present serious constitutional problems. In Lattab, the petitioner had not made the required showing of prejudice arising from his underlying removal proceedings, and thus the court was without authority to reach the question of the due process-related issues associated with the summary reinstatement process. Nevertheless, with one of my colleagues on this panel writing for the court, we noted:
Although this case does not provide a vehicle for testing the merits of the constitutional claim, we do not mean to imply that the claim is insubstantial.... While judicial review of reinstatement orders is available in the courts of appeals, that review may not be adequate when the alien has not been given a meaningful opportunity to develop an administrative record.
Lattab, 384 F.3d at 21 n.6 (internal citations omitted).
In my view, Garcia has satisfied the requirement of showing that he was prejudiced by the due process deficiencies in his underlying removal order. Therefore, I would find that just as the reinstatement of removal statute’s bar of “any relief’ does not literally mean “any relief,”[27] § 1231(a)(5)’s command that the prior order of removal “is not subject to being reopened or reviewed” does not actually mean “no reopening” and “no review” because such a reading, taken to its logical destination, would violate both the Suspension Clause and 8 U.S.C. § 1252.
To conclude, I would hold that the court is permitted to review the underlying removal order for serious due process defects when properly called upon to do so. I would further hold that a mechanical and categorical applicatiop of the reinstatement of removal statute (allowing it to trump the asylum statute, as the agency suggests and as the majority holds today), would render judicial vindication of such due process rights impossible. The majority’s ruling thus contravenes the court’s duty in cases where “a serious doubt of constitutionality is raised” to “first ascertain whether a construction of the statute is fairly possible by which [a constitutional] question may be avoided.” Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 348, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandéis, J., concurring) (quoting Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932)).
*53 III. The Reinstatement of Removal and International Law
The due process concerns alone might be sufficient to justify a more nuanced and case-by-case inquiry into whether the reinstatement statute should trump the right to apply for asylum in a particular petitioner’s case. However, these concerns, highlighted so vividly in Garcia’s case, also reinforce the most jarring problem with the majority’s conclusion that the reinstatement provision wins outright: such a reading would cause the United States to run afoul of international treaty commitments in an ordinary case, and even more so in cases where the alien was not afforded due process in the initial removal proceedings.
A. The Charming Betsy Canon
The interpretive principle that ambiguous federal statutes are to be interpreted in conformity with international law where feasible can be traced to a pair of Supreme Court cases, both arising out of the quasi-war with France: Talbot v. Seeman, 5 U.S. (1 Cranch) 1, 2 L.Ed. 15 (1801), and Charming Betsy, 6 U.S. at 64. In Talbot, Chief Justice Marshall’s opinion for the Court observed that “the laws of the United States ought not, if it be avoidable, so to be construed as to infract the common principles and usages of nations,” and thus, by the Court’s construction of the statute in question, “the act of congress will never violate those principles which we believe, and which it is our duty to believe, the legislature of the United States will always hold sacred.” Talbot, 5 U.S. at 43-44. The Charming Betsy case followed three years later, in which Chief Justice Marshall announced the more familiar maxim that “an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.” Charming Betsy, 6 U.S. (2 Cranch) at 118.
This interpretive principle is now firmly established in U.S. law and has been employed by the Supreme Court and this court on a regular basis when interpreting federal statutes. See, e.g., Weinberger v. Rossi, 456 U.S. 25, 32, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982) (noting that construing federal statutes to avoid violating international law has “been a maxim of statutory construction since the decision” in Charming Betsy); United States v. Lachman, 387 F.3d 42, 55 (1st Cir. 2004) (“We recognize that statutory and regulatory language should be construed in consonance with international obligations when possible.”); United States v. Hensel, 699 F.2d 18, 27 (1st Cir. 1983) (Breyer, J., for the court) (describing the Charming Betsy principle as “well established”); see also Restatement (Third) of Foreign Relations Law § 114 (Am. Law. Inst. 1987) (“Where fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States.”)[28]
*54 It is entirely appropriate in cases of statutory ambiguity[29] to adopt a reading of the statute that does not conflict with U.S. commitments under a non-self-executing treaty, precisely because the canon is concerned with the international obligations of the country, rather than the domestic enforceability of international law. See, e.g., Ma v. Ashcroft, 257 F.3d 1095, 1114 (9th Cir. 2001) (applying the Charming Betsy canon to avoid a violation of the International Covenant on Civil and Political Rights, which had been ratified by the United States but declared by the Senate to be non-self-executing). At least one circuit has applied the Charming Betsy canon in the context of a possible conflict between the INA and the Refugee Protocol. See Khan v. Holder, 584 F.3d 773, 783 (9th Cir. 2009) (“Under Charming Betsy, we should interpret the INA in such a way as to avoid any conflict with the [Refugee] Protocol, if possible.”)[30]
A treaty, ultimately, “depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it,” Medellin, 552 U.S. at 505, 128 S.Ct. 1346 (quoting Head Money Cases, 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884)), and there is no reason why the judiciary, as a co-equal branch of government, should interpret a statute in such a way that would violate a treaty, absent a clear showing by Congress that it desires this result. Applying the Charming Betsy doctrine is therefore consistent with the judiciary’s role to “say what the law is,” Marbury v. Madison, 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803), a role that extends to international law. See The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900) (“International law is part of our law, and must be ascertained and administered by the courts ... of appropriate jurisdiction.”).
B. The Refugee Convention
The Refugee Convention “was enacted largely in response to the experience of Jewish refugees in Europe during the period of World War II,” and the “tragic consequences of the world’s indifference at that time are well known.” Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 207, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (Blaek-mun, J., dissenting). Although the United States did not join the Convention, it acceded to the 1967 Protocol, and in so doing, the United States “agree[d] to comply with the substantive provisions of Articles 2 through 34” of the Refugee Convention. Congress soon followed with the Refugee Act of 1980, which amended the INA specifically to “bring United States refugee law into conformance with the 1967 Protocol.” Cardoza-Fonseca, 480 U.S. at 436, 107 S.Ct. 1207. Central to State obligations *55 under the 1967 Protocol (and the 1951 Convention) is the requirement that States provide “fair and efficient procedures for the determination of refugee status.” UNHCR Exec. Comm., General Conclusions on International Protection, No. 71 (XLIV), U.N. Doc. A/48/12/Add.l (Oct. 8, 1993).[31]
The majority correctly notes, ante at 42, that Garcia is a refugee under both statutory and international law. The Convention defines a “refugee” as one who, “owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country.” 19 U.S.T. at 6261. The INA more or less adopts this same definition, with exceptions not relevant here.[32] The Immigration Judge found that Garcia, who is clearly “outside the country of his nationality,” had a well-founded fear of persecution on account of both his membership in a particular social group and because of his religious activities, and there is no way that one could read the voluminous record in this case and not agree with that conclusion.[33] None of the exceptions under Article 1 of the Convention apply to Garcia.
As explained below, in light of that status, Garcia qualifies for certain rights and protections under international law, protections which the majority’s holding today denies to him. While the materials accom-j panying Garcia’s petition rely primarily oh Article 28 (the right to have a travel document) and Article 34 (the requirement that states facilitate the naturalization of refugees), for completeness’ sake, I note aspects of this case and aspects of the majority opinion that seem to be in tension with other portions of the Convention as well.[34]

*56
i Article 17

Article 17 of the Convention requires that states “shall accord to refugees lawfully staying in their territory the most favourable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to engage in wage-earning employment.” 19 U.S.T. at 6269. The travaux préparatoires to the Convention notes that, as used in Article 17, “most favourable treatment” is defined as “the best treatment which is accorded to nationals of another country by treaty or usage.” See UN High Commissioner for Human Rights, The Refugee Convention, 1951: The Travaux Prépara-toires Analyzed with a Commentary by Paul Weis 94 (hereinafter “Weis, Tra-vaux”). An early draft of Article 17, provided by the Secretariat, noted that “[ble-cause of their limited resources and their status, wage-earning employment is the only type of employment to which most refugees can aspire,” and the commentary to Article 17 concludes it is “one of the most important of the Convention.” Id at 97.
The article is essentially a requirement that member states grant refugees the unrestricted right to work, on par with the rights that would be extended to other aliens. Yet, as noted above, withholding of removal status requires the periodic refiling of work applications to USCIS, which has discretion to reject or delay the applications, and the expiration of a permit results in the inability for the alien to work legally, in contrast with asylum status, where the expiration of the permit does not deprive the asylee of the right to work. See 8 C.F.R. § 274a.l2(a)(5). Additionally, asylees are exempted from the class of aliens who “must apply” to USCIS “for a document evidencing such employment authorization,” while aliens in withholding of removal are not. Id. § 274a.l2(a). Because state parties are obliged to extend the most favorable treatment to refugees (comparable, at minimum, to the treatment they extend to non-refugee aliens from the same country), the imposition of a more cumbersome work permit program for aliens in withholding of removal status who are seeking employment likely violates the spirit, if not the letter, of Article 17.

ii. Article 28

Article 28 of the Convention requires that “[t]he Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory, unless compelling reasons of national security or public order otherwise require.” 19 U.S.T. at 6274. This requirement arose from a recognition that “[rjefugees who do not enjoy the protection of the authorities of their country of origin do not have national passports” and “would therefore be unable to leave the initial reception country if a document replacing the passport had not been established for their benefit.” Weis, Travaux, at 157.
While considering several proposed drafts of Article 28, the U.K. representative noted that were a refugee not issued a travel document by the state in question, “the refugee would probably not be allowed to enter other countries, for they would hesitate to admit him for fear that they might be obliged to keep him permanently on their territory without this provision.” Weis, Travaux, at 161. The U.S. representative said that while “the US had not adhered to any convention or agreement relating to travel documents for refugees” prior to these discussions, he could “assure the Committee that refugees resident in the US would ordinarily be able to leave the country and to return to it.” Id. at 162 (emphasis added).
*57 Article 28 is a categorical requirement, “a mandatory obligation on Contracting States to issue the document,” see Weis, Travaux, at 194, yet an alien who has been granted withholding of removal (as opposed to asylum) is not eligible for such a travel document, which essentially renders him trapped in the United States (at least unless the government finds a third country that is willing to take him). Because these documents are unavailable for people afforded withholding of removal status, the grant of withholding of removal to an individual that otherwise qualifies as a refugee (like Garcia) is a per se violation of the Convention.
The majority’s rejoinder to this point is that the clause allowing for exceptions to this requirement when “compelling reasons of national security or public order otherwise require” allows the government to skirt this requirement because “deterring repeated unlawful entry into this country” is a “compelling reason[ ] of ... public order.” See ante at 42. This is a temporal non-sequitur, because the government has already made a decision that Garcia meets the “reasonable fear” requirement for withholding of removal. If concerns of “public order” dictated that Garcia be kept out of the United States, then the United States would have various grounds to refuse to grant him withholding of removal. But after deciding that Garcia poses no such threat, on what possible basis could the government argue that “public order” considerations required that he not be permitted to leave the United States for some other country?
Nor is the majority correct in its suggestion that Garcia needs to make “an argument to the contrary” for why the United States does not have a “compelling reason of ... public order” for denying travel documents to individuals in withholding of removal. Id. That suggestion places the burden on the wrong party, because “the issue of the travel document is an obligation” imposed on the state, and applies “unless compelling reasons of public security or public order justify a refusal.” Weis, Travaux, at 194 (emphasis in original). Examples given for such “compelling” grounds in the commentaries include “cases where a refugee seeks to escape prosecution or punishment for a criminal offence or where the refugee is suspected of travelling in order to engage in criminal or espionage activities.” Id. It would not, it seems to me, apply to the issuance of a travel document to an alien, like Garcia, who had already been determined to have qualified for protected status and already had a full security screening as part of the withholding of removal process.

Hi Article SI

Article 31 of the Convention provides that “[t]he Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened ... enter or are present in their territory without authorization,” 19 U.S.T. at 6275. This treaty commitment is implemented in the INAby the provision, at issue in this case, which allows individuals to apply for asylum “irrespective of such alien’s status,” 8 U.S.C. § 1158(a)(1), because to deny asylum relief to a refugee that has flouted a country’s border control or immigration laws because of the urgency with which he was required to leave his home country would be to penalize him for the very fact of being a refugee, see 8 U.S.C. § 1101(a)(42) (recognizing that refugees, by definition, are fleeing persecution); UN Ad Hoc Committee on Refugees and Stateless Persons, Memorandum by the Secretary-General, UN Doc. E/AC.32/2, Ch. XI, Art. 24. Para. 2 (Jan. 3, 1950) (“A refugee *58 whose departure from his country of origin is usually a flight, is rarely in a position to comply with the requirements for legal entry (possession of national passport and visa) into the country of refuge.”) For this reason, the principle of non-penalization is described in UNHCR’s Introductory Note to the Convention as one of the most notable “fundamental principles” which “underpin[s]” the Convention’s commitment to rights protection, along with non-discrimination and non-refoulement. See Introductory Note (UNHCR) (2010), UN Convention Relating to the Status of Refugees (“This recognizes that the seeking of asylum can require refugees to breach immigration rules.”).
Because of the importance of this provision, “penalties” cannot be interpreted as merely the assessment of a fine or imprisonment, but must be applied flexibly to assess whether a state party is denying the full scope of refugee protection to a particular individual on account of his or her illegal entry into the state’s territory.[35] See Refugee Convention, Introductory Note (“Prohibited penalties might include being charged'with immigration or criminal offences relating to the seeking of asylum, or being arbitrarily detained purely on the basis of seeking asylum”); see also James C. Hathaway, The Rights of Refugees Under International Law 405 (2005) (stating that penalties may include “sanctions that might ordinarily be imposed for breach of the asylum state’s general migration control laws”). Though not defined in the Convention, the commentary notes that “[i]t is clear from the travaux prépar-atoires that [’penalties’] refers to administrative or judicial convictions on account of illegal entry or presence, not to expulsion.” Weis, Travaux, at 219.
Here, although the penalty imposed on Garcia is not in the form of a criminal conviction, it is, in essence, an administrative sanction on account of his earlier illegal entry—one automatically imposed by 8 U.S.C. § 1231(a)(5) without regard to the underlying circumstances in a petitioner’s case. See Penalty, Black’s Law Dictionary (10th ed. 2014) (defining a “statutory penalty” as one that is “imposed for a statutory violation; esp., a penalty imposing automatic liability on a wrongdoer for violation of a statute’s terms.”). It is also worth noting that an Amendment was introduced by the Austrian delegate during the Convention negotiations which would have provided that the non-penalization provision “shall not apply, however, to a refugee against whom an expulsion or residence order has been issued under a judicial or administrative decision of the State in which he seeks asylum.” Weis, Travaux, at 214. This amendment, which describes Garcia’s situation in spades, was voted down overwhelmingly, see id. at 216, and the final non-penalization provision of Article 31 did not distinguish a state’s obligation to a refugee based on the existence of a prior deportation or removal order against the same refugee.[36]
*59 Case law from other signatory states and from international courts also supports a flexible interpretation of “penalties.”[37] For instance, in R v. Uxbridge Magistrates Court and Another, ex parte Adimi, the U.K. High Court (Divisional Court) noted that Article 31’s protections “extend[ed] not merely to those ultimately accorded refugee status but also to those claiming asylum in good faith,” and that the non-penalization obligation had as its broad purpose “to provide immunity for genuine refugees whose quest for asylum reasonably involved them in breaching the law.” [1999] EWHC (Admin) 765, [15-16] (Eng.); see also UK Soc. Sec. Comm. Dec. No. CIS/4439/98, ¶ 16 (Nov. 25, 1999) (noting that interpreting “penalties” narrowly would “put[] form above substance and would enable contracting states to evade Article 31”). In interpreting the word “penalty” as used in the International Covenant on Civil and Political Rights (ICCPR), the UN Human Rights Committee has embraced a similarly flexible approach. See Van Duzen v. Canada, UNHRC Comm. No. 50/1979, ¶ 10.2 (Apr. 7, 1982) (stating that Article 15 of the ICCPR, which prohibits the imposition of “a heavier penalty ... than the one that was applicable at the time when the criminal offence was committed,” should be interpreted according to the “object and purpose” of the treaty as a whole).
In short, because the majority’s approach categorically prevents an alien in Garcia’s situation from applying for relief that would be available to other aliens, I would consider this administrative roadblock to constitute an impermissible “penalty” that is imposed on Garcia, likely triggering a violation of Article 31 because the penalty is imposed before Garcia’s status as a refugee can be determined. See Hathaway at 407 (noting that it is “lawful for a government to charge an asylum-seeker with an immigration offense, and even to commence a prosecution, so long as no conviction is entered until and unless a determination is made that the individual is not in fact a Convention refugee.”). Viewing this administrative ruling as a penalty makes particular sense in a case like Garcia’s, where the Attorney General’s practices in the first instance of illegal entry have “deprive[d] the asylum seeker of the right to gain effective access to the procedure for determining refugee status.” Amuur v. France, Eur. Ct. H.R., App. No. 19776/92, ¶ 43 (1996) (emphasis added).

iv. Article 3⅛

Taken together, the above violations lend credence to Garcia’s argument that the government’s position likely violates Article 34 of the Convention. That provision, as noted in the majority opinion, provides that “[t]he Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees.” 19 U.S.T. at 6276 (emphasis added). While “precato-ry,” Cardoza-Fonseca, 480 U.S. at 441, 107 S.Ct. 1207, and non-self-executing, Stevie, 467 U.S. at 428, 104 S.Ct. 2489, I have serious doubts as to whether the bifurcated system of withholding of removal and asylum comports with the basic spirit of Article 34, particularly when an alien’s initial removal order was bereft of basic fairness and process.
*60 There is one final way in which a reading of the statute that. only allows for withholding of removal to a petitioner like Garcia is in serious tension with Article 34’s commitment to facilitate the assimilation and naturalization of eligible refugees, and also with Article 31’s prohibition on “penalizing” refugees. As both the majority opinion and Section I.F of this dissent point out, an alien must meet a much higher evidentiary showing to qualify for withholding of removal.
Aliens with previous removal orders, therefore, have to meet a higher burden to get less relief, even when they never had a meaningful opportunity to meet the lesser burden and receive the right to apply for more relief. I question how this could possibly be consistent with the object and purpose of Articles 31, 34, and the Convention as a whole. Ultimately, even though Article 34 “is in the form of a recommendation,” Weis, Travaux, at 251, it seems very doubtful to me whether this is a recommendation that we as a country are following in good faith.
C. The ICCPR
Although the petitioner does not raise this issue, I want to note one final Charming Betsy problem: the approach adopted by the majority today leaves in place a structure, evidenced by.Garcia’s situation, which deprives aliens on U.S. soil of the fair trial guarantees enshrined in the International Covenant on Civil and Political Rights, 999 U.N.T.S. 171. The ICCPR was signed by the United States in 1976 and ratified thereafter by the Senate in 1992. Similar to the Refugee Protocol, the ICCPR was ratified “on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts.” Sosa v. Alvarez-Machain, 542 U.S. 692, 735, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).
Notwithstanding its non-self-executing status, the Supreme Court and lower federal courts have frequently consulted the ICCPR as an interpretive tool to determine important issues in the area of human rights law. See, e.g., Roper v. Simmons, 543 U.S. 551, 576, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (referring to the ICCPR to support the prohibition on the juvenile death penalty); Ma, 257 F.3d at 1114 (relying on Article 9 of the ICCPR, which prohibits arbitrary arrest or detention, when interpreting a provision of the INA); Igartúa-De La Rosa v. United States, 386 F.3d 313, 319 (1st Cir. 2004) (Torruella, J., dissenting), reh’g granted, judgment vacated, 404 F.3d 1 (1st Cir. 2005) (stating that, despite its non-self-executing status, “I am nonetheless compelled to recognize that the United States is in violation of its obligation under Article 25 to afford universal suffrage to its citizens” with respect to voting rights of residents of Puerto Rico).
The ICCPR applies to “all individuals within [a State’s] territory and subject to its jurisdiction,” ICCPR art. 2, ¶ 1, a category which includes aliens. Most pertinent to this case, Article 14 of the ICCPR lays out the basic protections for the right to a fair trial.[38] Among these basic rights are: “[t]o be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him,” Art. 14(3)(a); “[t]o have adequate time and facilities for the preparation of his defence and to communicate with counsel of his own choosing,” Art. 14(3)(b); “to *61 be informed, if he does not have legal assistance, of this right; and to have legal assistance assigned to him, in any case where the interests of justice so require,” Art. 14(3)(d); and “[t]o have the free assistance of an interpreter if he cannot understand or speak the language used in court,” Art. 14(3)(f).
As I have emphasized throughout this dissent, none of these rights, which are also protected under U.S. law and broadly apply to aliens in removal proceedings, were extended to Garcia during his initial removal proceedings. True, the government has apparently remedied these violations in the instant case: Garcia is coum seled and had access to an interpreter during the 2015 proceedings. However, the government’s interpretation of the INA is essentially a “one strike and you’re out” policy, so it does no good for Garcia to have access to these basic due process protections now, when he has already been hoodwinked by the Potemkin process that infected his initial encounter with our justice system. It would presumably come as no surprise to Garcia to learn that a Government Accountability Office Report conducted the year after his initial removal concluded that “having [legal] representation was associated with more than a three-fold increase in the asylum grant rate compared to those without representation.” See U.S. Gov’t Accountability Office, GAO-08-940, U.S. Asylum System: Significant Variation Existed in Asylum Outcomes Across Immigration Courts and Judges 30 (2008). It would also do no good for him to learn this after the fact.
Because none of the basic elements of due process were met in Garcia’s initial removal proceedings, and because the approach taken by the majority today leaves in place a deferential legal scaffolding that allows such tainted procedures to go unchecked, I would also find that deference to the agency on this statutory question causes the United States to be in violation of its commitments under the ICCPR’s fair trial provisions.
IV. Conclusion
There is much to be said for the majority’s observation that “[ijmmigration law is distinguished by its complexity more than by its clarity.” Ante at 30. In the face of such complexity, it can be tempting to throw up our hands and say that while these immigration cases are sad (and they often are), we will simply defer to the immigration authorities’ reasoned judgment as to its statutory mandate, never mind the consequences and never mind the volume of due process and international law principles that are trampled along the way.
This sort of judicial muscle memory may be the easy answer, but it is not always the correct one. Because the petitioner in this case was not afforded due process in his underlying removal proceedings, and because we are obliged to interpret statutes in consonance with international treaty obligations where fairly possible, we need not defer to an agency interpretation which violates these obligations.
I therefore dissent.

. The record is replete with evidence that Garcia could not comprehend legal proceedings in Spanish. On his application for asylum in 2015, on the section of the form which asked what languages the applicant speaks, Garcia wrote “Spanish (not fluently).” At his hearing before an asylum officer in May 2015, a proceeding designed to determine whether he had a reasonable fear of being removed to Guatemala, officials instructed Garcia to give his answers in K’iche and provided him with an interpreter. The government also provided Garcia with a K’iche interpreter during the proceedings before the Boston Immigration Judge for withholding of removal. One wonders what the Government learned between 2007 and 2015 which led it to conclude, in the latter instance, that Garcia required a K’iche interpreter so as to have the benefit of due process.

. Garcia himself confirmed as much at his 2015 reasonable fear hearing before an asylum officer (this time with the benefit of a K’iche interpreter):
Q: Have you ever been denied anything or any rights because you are Mayan?'
A: Yes a lot of things have been denied for me since I don’t speak Spanish and I didn’t go to school.
Q: What have you been denied since you don’t speak Spanish?
A: I don’t understand when people talk to me so I just remain quiet because I don’t understand.

. Protocol Relating to the Status of Refugees, 19 U.S.T. 6223 (Nov. 6, 1968). Because accession to the Protocol required that the United States comply with all substantive aspects of the 1951 United Nations Convention *47 Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951), I will refer to the “Refugee Convention’’ or the "Convention” when describing U.S. international law obligations under this treaty regime.

. By contrast, for aliens granted asylum, the regulations stipulate that "[a]n expiration date on the employment authorization document issued by USCIS reflects only that the document must be renewed, and not that the bearer's work authorization has expired.” See 8 C.F.R. § 274a. 12(a)(5). Additionally, asylees are exempt from the classes of aliens who "must apply” to USCIS for a work permit, id. § 274a. 12(a), with the regulations obliquely noting that asylees may be employed by virtue of "an employment authorization document, issued by USCIS to the alien,” with no requirement that they apply for this document, id. § 274a. 12(a)(5). While it is not clear whether the issuance of the work permit to asylees is therefore obligatory on the part of USCIS, at minimum it seems obvious that aliens in withholding of removal encounter additional procedural hurdles in order to work legally.

. See generally USCIS Form 1-131, Application for Travel Document Instructions 1 (rev. Dec. 13, 2016), available at http://www.uscis. gov/files/form/i-13linstr.pdf (noting that a *48 “Reentry Permit allows a lawful permanent resident or conditional permanent resident to apply for admission to the United States upon returning from abroad” and that “[a] Refugee Travel Document is issued to an individual in valid refugee or asylee status, or to a lawful permanent resident who obtained such status as a refugee or asylee in the United States.”). Because aliens granted withholding of removal status technically still have a removal order entered against them, they do not have either Refugee or Asylee status and thus may not apply for the reentry permit.

. As the majority notes, the clear-probability test for withholding of removal "is more demanding than the 'well-founded fear’ test” that applies in asylum cases. Ante at 32 (citing INS v. Cardoza-Fonseca, 480 U.S. 421, 449-50, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

. See Mark Twain, Foster's Case, N.Y. Tribune, Mar. 10, 1873, at 5 (“To my mind Judas was nothing but a low, mean, premature Congressman.”)

. Immigration Judge: When you were in front of the Immigration Judge in 2007, why didn't you tell him of your fear of these Ladi-no gangs?
Garcia (through an interpreter): I did not tell them anything because they did not ask me any questions whether I was afraid. That's why I didn’t tell them anything.
Counsel for Garcia: Your honor, for the record, they didn't understand what was going on. We went down to Texas. The Federal Judge sent us down. We talked to everybody. They didn't understand what was going on.

. The recent Fifth and Eleventh Circuit cases interpreting this issue included cursory treatments of the underlying removal proceedings, which makes it difficult to discern whether the proceedings in those cases violated the basic due process protections of the petitioners in a similar fashion to Garcia. See Ramirez-Mejia v. Lynch, 794 F.3d 485, 487 (5th Cir. 2015) (“Ramirez-Mejia I”) (noting only that the petitioner "was apprehended while illegally entering the United States” and "was subsequently removed from the country”); Jimenez-Morales v. U.S. Atty. Gen., 821 F.3d 1307, 1307-08 (11th Cir. 2016) (explaining that, "after having been removed to Colombia,” petitioner again tried to enter the United States without authorization).

. In a short denial for rehearing en banc, the Fifth Circuit in Ramirez-Mejia noted in passing that “we find no treaty obligation in conflict with our holding” because Article 34 of the Refugee Convention is a "precatory” provision (citing Cardoza-Fonseca, 480 U.S. at 441, 107 S.Ct. 1207) and Congress left intact the right to apply for withholding of removal and protection under the Convention Against Torture (CAT) in the IIRIRA. See Ramirez-Mejia v. Lynch, 813 F.3d 240, 241 (5th Cir. 2016) (“Ramirez-Mejia IT'). However, the Court did not address other pertinent sections of the Refugee Protocol, nor did it address whether the availability of CAT protection and the possibility of withholding of removal are sufficient to satisfy U.S. obligations under the Protocol.

.I disagree with the majority's contention that because the due process issue was "not set forth as a developed argument,” these concerns have "no bearing on this appeal.” Ante, at 35 n.6. While Federal Rule of Appellate Procedure 28(a) generally requires that parties develop arguments in some detail in their briefs or risk having them be deemed waived, see Ahmed v. Holder, 611 F.3d 90, 98 (1st Cir. 2010), this principle is a “prudential construct that requires the exercise of discretion,” U.S. v. Miranda, 248 F.3d 434, 443 (5th Cir. 2001), and some courts have determined that they "have discretion to consider issues not raised in the briefs, 'particularly where substantial public interests are involved.’” Hatley v. Lockhart, 990 F.2d 1070, 1073 (8th Cir. 1993) (quoting Continental Ins. Cos. v. Ne. Pharm. & Chem. Co., Inc., 842 F.2d 977, 984 (8th Cir.), cert. denied, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988)). Here, Garcia’s brief raises the lack of due process afforded to him in his initial removal proceedings, and even if his brief does not develop these facts into an express argument for why his preferred statutory construction is correct, I would consider that the "substantial public interests,” id at 1073, at stake in this dispute counsel against applying the usual waiver rule.

. While aliens in removal proceedings do not enjoy the protections of the Sixth Amendment’s right to counsel, the INA itself provides this guarantee (along with other due process protections). See 8 U.S.C. § 1229 (a)(1)(E) ("The alien may be represented by counsel and the alien will be provided (i) a period of time to secure counsel ... and (ii) a current list of counsel” provided by the Attorney General); see also Lattab v. Ashcroft, 384 F.3d 8, 18 (1st Cir. 2004) ("In general, section 240 entitles aliens to be represented by counsel, to be heard by an immigration judge, to adduce evidence, and to cross-examine adverse witnesses.”). Fifth Amendment due process protections also apply in removal proceedings. See Demore v. Kim, 538 U.S. 510, 523, 123 S.Ct. 1708, 155 L.Ed.2d 724, (2003) (“It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.” (quoting Reno v. Flores, 507 U.S. 292, 306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993))).

. See U.S. Const, art. 1, § 9, cl. 2 (“The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.”).

. As the majority notes, aliens with previous removal orders can apply for cancellation of removal, departure as an alternative to removal, and adjustment of status, all forms of "relief” under the INA. See ante at 36 n.7.

. As an initial matter, I agree with the majority that there should be no objection to the application of the Charming Betsy canon to this case. The government's cursory argument, that the Refugee Protocol is not a self-executing treaty and thus it is inappropriate to apply the Charming Betsy canon, is a clear misfire. Even assuming arguendo that the relevant portions of the Refugee Protocol are not self-executing, application of the Charming Betsy canon would remain unaffected. The question of whether a treaty is self-executing speaks to whether the international agreement in question can be enforced as domestic law in the courts of the United States without implementing legislation, not whether the treaty is an international obligation on the part of the country as a whole. In Medellin v. Texas, the Supreme Court recognized that even treaty provisions that do not constitute binding federal law enforceable in United States courts may still “constitute[] an inter *54 national law obligation on the part of the United States.” 552 U.S. 491, 504, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008); accord Restatement (Third) § 321 ("Every international agreement in force is binding upon the parties to it and must be performed by them in good faith.”).

. Like other interpretive canons, "[t]he Charming Betsy canon comes into play only where Congress's intent is ambiguous.” United States v. Yousef, 327 F.3d 56, 92 (2d Cir. 2003).

. Although one of our sister circuits has interpreted the canon as only applying "where conformity with the law of nations is relevant to considerations of international comity,” see Serra v. Lappin, 600 F.3d 1191, 1198 (9th Cir. 2010), I would note that even if we were to apply this minority rule (which we have not previously done), there are certainly significant “foreign policy implications,” Weinberger, 456 U.S. at 32, 102 S.Ct. 1510, to whether (and to what extent) the United States abides by its treaty commitments to provide protection to individuals fleeing religious and political persecution. One need only open a newspaper to see why this is so.

. Although not binding, the views of the Office of the United Nations High Commissioner for Refugees (UNHCR) have been cited by the Supreme Court for interpretive guidance given that office's expertise and responsibilities for monitoring refugee issues. See, e.g., Negusie v. Holder, 555 U.S. 511, 536-37, 129 S.Ct. 1159, 173 L.Ed.2d 20 (2009) (consulting the UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status, "to which the Court has looked for guidance in the past”); Cardoza-Fonseca, 480 U.S. at 439, 107 S.Ct. 1207 (seeking guidance in interpreting the “well founded fear” test under the Refugee Convention and Protocol from the position of UNHCR).

. See 8 U.S.C. § 1101(a)(42)(A).

. In the spirit of this case, I suppose if one could not read Spanish or English and did not have the opportunity to have the record explained to them in their native tongue, they might not be able to form an opinion one way or another on this conclusion.

. To be clear, Garcia’s actual Charming Betsy claim is that "[t]he Agency's interpretation of INA § 241(a)(5) in a way which deprives Mr. Garcia of the opportunity to have his asylum case heard, violates its obligations under the Convention and Protocol” and that the accompanying DHS regulations "are premised on an interpretation which does not comport with U.S. obligations under the Protocol and Convention and which is in violation of international law.” Articles 34 and 28 are cited as examples, but I interpret his claim to be based on U.S. commitments under these treaty regimes more generally, and he makes several arguments about the relative paucity of benefits available under withholding of removal that would otherwise be available for aliens granted asylum, all of which collectively implicate a variety of provisions under the Refugee Convention aside from Articles 28 and 34. Given that the focus of the Charming Betsy canon is on the international law obligations of the United States as a whole, rather than the domestic enforceability of those rights, and given what I consider to be a clear incongruity between U.S. treaty obligations and the automatic reinstatement of removal process, I find these additional provisions of the Refugee Convention to be of sufficient importance that they warrant exploration notwithstanding Garcia's failure to explicitly raise them in his brief, for the same reasons identified at supra/ note 24.

. We have previously held that detention of an alien does not violate Article 31 because that provision "was not intended to prevent a government from detaining one who attempted to enter illegally, pending a final decision as to whether to admit or exclude the person.” Amanullah v. Nelson, 811 F.2d 1, 16 n.10 (1st Cir. 1987). Here, however, the Article 31 problem is not detention but the denial of certain forms of relief that would otherwise be available to aliens (the right, in this case, merely to apply for asylum), and in Garcia’s case, unlike in Amanullah, the government has already made a decision not to exclude Garcia from the country.

. Indeed, the Commentary and travaux pré-paratoires suggest that "[i]n the case of asylum-seekers, proceedings on account of illegal entry or presence should be suspended pending examination of their request,” see Weis, Travaux, at 219. In other words, states are *59 obliged to hear the asylum claim first before forging ahead with ordinary removal or deportation "proceedings on account of illegal entry or presence.” Id.

. When "interpreting any treaty, [t]he 'opinions of our sister signatories’ ... are 'entitled to considerable weight.’ ” Abbott v. Abbott, 560 U.S. 1, 16, 130 S.Ct. 1983, 176 L.Ed.2d 789 (2010) (quoting El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 176, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) (alterations in original)).

. The Refugee Convention, too, provides that all refugees "shall have free access to the courts of law on the territory of all contracting states,” Refugee Convention, Art. 16, a right that "applies to all refugees wherever resident and whether the residence is lawful or not.” Weis, Travaux, at 97.